UNCLASSIFIED//FOR PUBLIC RELEASE

FILED WITH
COURT SECURITY OFFICER
8|12|09
DATE

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ADHAM MOHAMMED ALI AWAD | : | |
| | : | |
| Petitioner, | : | Civil Action No. 05-CV-2379 |
| v. | : | |
| | : | |
| BARACK H. OBAMA, *et al.*, | : | |
| | : | |
| Respondents. | : | |

### MEMORANUM ORDER DENYING WRIT OF HABEAS CORPUS

Adham Mohammed Al Awad, a citizen of ▮▮ b(1), b(6) alleges

that he is illegally detained at Guantanamo Bay Naval Base

and petitions this Court for a writ of *habeas corpus* to

secure his release.  The parties have cross-moved for

judgment on the record.  The government's motion will be

granted.

## I. Background

Awad has been in U.S. custody since his capture in

Afghanistan on ▮▮ b(2) ▮▮.  He filed his petition

four years ago, but that petition and hundreds like it were

put on hold until various legal issues, including the

jurisdiction of this Court, were resolved.  After the

Supreme Court held that detainees like Awad have a right to

bring *habeas* petitions and that federal district courts

have jurisdiction to hear them, *Boumediene v. Bush*, 553

U.S. ---, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), and after

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Judge Hogan issued his omnibus Case Management Order that has guided the Guantanamo habeas cases' procedures, this case moved on to the merits.

The government filed a factual return asserting the grounds on which Awad is detained – the claim is that he is an al Qaida fighter - and the evidence supporting that claim.  Awad then made several requests for discovery.  I denied some of those requests outright and denied others without prejudice to their later renewal with the kind of specificity required of motions under Fed. R. Civ. P. 56(f).  Awad submitted his traverse without renewing his discovery requests.  Both sides then moved for judgment on the record and a hearing on those cross-motions was held on July 31, 2008.

The government's core narrative is that Awad volunteered or was recruited for Jihad soon after September 11, 2001 and traveled from his home in [b(1), b(6)] to Afghanistan; that he trained at the Al Qaida "Tarnak Farms" camp outside Kandahar; that Awad and a group of other Al Qaida fighters were injured in a U.S. air strike at or near the airport in Kandahar and went to Mirwais Hospital for treatment; that these men then barricaded themselves in a section of the hospital; that U.S. and associated forces laid siege to the hospital; that Awad's comrades gave him

- 2 -

UNCLASSIFIED//FOR PUBLIC RELEASE

up because they could not care for his severely injured
██████ and that, after Awad's
capture, his al Qaida comrades fought to the death.

The government offers five groups of evidence in
support of their narrative: (1) Intelligence reports of
Awad's statements to interrogators; (2) statements of a
former Guantanamo detainee named ████ who was inside
Mirwais Hospital during the siege and who gave a list of
names and descriptions of the Al Qaida fighters, including
a man with an ██████ who went by the name ████
████ -- a *kunya* allegedly associated with Awad[1]; (3)
███████████████████████████
███████████████████████████
████████████ ; (4)
a list found at Tarnak Farms bearing the name ████
and several of the names that also appear ████
████ on ████ list of names; and (5) newspaper
articles published in American newspapers about the siege
at Mirwais Hospital.

---

[1] A *kunya* is a sort of traditional, honorific nickname.
████ Decl. at 2. A man's *kunya* will often
be the word "abu" - literally translated to mean father -
and then the name of his first born child. *Id.* According
to ████ Al Qaida members also use *kunyas*
as honorific pseudonyms. *Id.* These *kunyas* are not
dependent on whether an individual is a father and are
sometimes used to conceal a true identity.

UNCLASSIFIED//FOR PUBLIC RELEASE

Petitioner's story is that he traveled to Afghanistan in mid-September 2001 in order to visit another Muslim country for a few months, intending to return home after his visit; that in early November 2001 he was injured and knocked unconscious during an air raid while walking through a market in Kandahar; that he woke up in Mirwas Hospital after part of his ███████████████████; that he was heavily medicated, floated in and out of consciousness, slept constantly, and could barely sit up; and that he remained in this condition until his capture.

Awad's case relies mostly on weaknesses and holes in the government's evidence, but, in support of his narrative, he submits an unsigned affidavit, a declaration from his counsel, and different intelligence reports of different statements made to interrogators.

## II. Legal Standards

> The President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Authorization of Military Force, Pub. L. 107-04, 115 Stat. 224 (2001).

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

## A. Substantial Support

The government's position is that:

> [t]he President has the authority to detain
> persons that the President determines
> planned, authorized, committed, or aided the
> terrorist attacks that occurred on September
> 11, 2001, and persons who harbored those
> responsible for those attacks.  The President
> also has the authority to detain persons who
> <u>were part of</u>, or substantially supported,
> Taliban or <u>al-Qaida forces</u> or associated
> forces that are <u>engaged in hostilities
> against the United States or its coalition
> partners</u>, including any person who has
> committed a belligerent act, or has directly
> supported hostilities, in aid of such enemy
> armed forces.

Respondent's Revised Memorandum Regarding the Government's

Detention Authority Relative to Detainees Held at

Guantanamo Bay at p. 3 (emphasis added).

In a thoughtful decision that has been followed by

many if not most of the judges of this court, *Hamily v.*

*Obama*, 2009 WL 1393113 (D.D.C. 2009), Judge Bates wrote

that the "key inquiry" when analyzing the "part of . . . al

Qaeda" test is "whether the individual functions or

participates within or under the command structure of the

organization-*i.e.* whether he receives and executes orders

or directions."  *Hamily*, 2009 WL 1393113 at * 8 (internal

citations omitted).  I have adopted Judge Bates' approach.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

## B. Hearsay, Authenticity, Chain of Custody

The government's case relies on "raw" intelligence data, multiple levels of hearsay, and documents whose authenticity cannot be proven (and whose provenance is not known and perhaps not knowable).  Awad argues that such evidence should excluded because the government has not made individualized showings that "the hearsay evidence is reliable and that the provision of nonhearsay evidence would unduly burden the movant or interfere with the government's efforts to protect national security."  CMO II (A).  The government responds generally (not with individualized showings) that its intelligence documents are reliable because they were created during the intelligence gathering process and explains generally why the presentation of non-hearsay evidence would be a burden.  The government urges that documents and reports generated for intelligence purposes should be accorded a presumption of reliability and credibility.

The suggestion of a presumption of reliability and credibility goes too far because it would seem to place the burden of rebuttal on the petitioner.  I have instead formally "received" all the evidence offered by either side but have assessed it item-by-item for consistency, the conditions in which statements were made and documents

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

found, the personal knowledge of a declarant, and the
levels of hearsay.  In other words, I have given the
evidence the weight I think it deserves.

## C. Burden of Proof

The government had the burden of proving the
lawfulness of detention by a preponderance of the evidence.
CMO II (A); *accord, Al Bihani v. Obama,* 594 F.Supp.2d 35
(D.D.C. 2009); *Ali Ahmed v. Obama,* 613 F.Supp.2d 51 (D.D.C.
2009).  The burden of proof never shifted to Awad.  No
inference was drawn from Awad's decision not to testify or
from his failure to sign or swear to his affidavit.

## D. Detention for the Continuation of Hostilities

I acknowledge the power of Judge Huvelle's argument in
*Basardh v. Obama,* 612 F.Supp.2d 30, 34 (D.D.C. 2009), that
"the AUMF does not authorize the detention of individuals
beyond that which is necessary to prevent those individuals
from rejoining battle," but I decline to follow it in this
case and have not considered whether or to what extent the
continued detention of Awad supports the AUMF's self-stated
purpose of "prevent[ing] . . . future acts of international
terrorism," Pub. L. 107-04, 115 Stat. 224.  Awad is a
marginally literate b(1) who has spent more than seven
of his twenty six years - since he was a teenager - in
American custody.  It seems ludicrous to believe that he

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

poses a security threat now, but that is not for me to decide. Combat operations in Afghanistan continue to this day and – in my view – the President's "authority to detain for the duration of the relevant conflict" which is "based on longstanding law-of-war principles" has yet to "unravel." *See, Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (2004).

### III. The Evidence

**A. "Then Why He Here"**



---

[2] In his affidavit, Awad claims that any incriminating statements he made were made "as a result of torture, the threat of torture or coercion and are therefore unreliable." Awad Aff. ¶ 5; Jones Aff. ¶ 7. The only specific allegation of coercion is the claim that interrogators threatened to withhold medical treatment

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



until Awad provided them information. The government retorts that interrogators' notes reveal that Awad was provided care and that he used his medical condition as an excuse to avoid answering difficult questions.

- 9 -

## B. Training

The name "Abu Waqas" appears twice (once crossed out) on a list of names found in a one hundred page document retrieved from Al-Qaida's "Tarnak Farms" training camp in Kandahar sometime after that facility was taken by U.S. and associated forces.[3] `[D2 ████████████]` An intelligence report states that the document also contains notes on small arms and sniper training instruction, and aiming and distance calculations. `[C2 ████████]`

Awad denies any association with the name "Abu Waqas," but this denial is not credible. He has identified himself on at least one occasion as "Waqqas Adham Mohammed Ali Ala-Awad." ISN 88 FD-302 (May 4, 2002). `[b(1) ████████]` `[b(1) ████████]` `[b(1) ████████]` `[b(2) ████]` `[b(2) ████████]` At the merits hearing petitioner's counsel fine-tuned the argument to an assertion that Awad never used the honorific "Abu" before "Waqas." That position is inconsistent with the other evidence. "Abu" appears before 53 of the 59 names on the Tarnak Farms list. `[D2 ████████]` `[D3 ████████]` Decl. at 2.

---

[3] There is no dispute that Tarnak Farms was an Al Qaida camp that provided advanced training. *See, generally,* `[D3 ████]` Decl.

UNCLASSIFIED//FOR PUBLIC RELEASE

Except for the appearance of what seems to be his name on a list, however, the evidence that Awad received training at Tarnak Farms is nonexistent.  We do not know the purpose of the list or when it was written.  Even the translator claimed only that it was "possibly" a list of trainees.  [D2] ████████████ [b(1)] ████████
[b(1)] ██████████████████████████████████
[b(1)] ████████████    Awad Aff. ¶¶3-6; [b(2)] █████████
[b(2)] ██████████  [b(1)] ██████████████████████
[b(1)] ████████████; [b(2)] ████████████  (". . . never received any training.").



[b(2)] ████████████.  That account may be implausible, but, in the absence of better evidence on the government's side, I find the claim of Tarnak Farms training to be unsupported.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

## C. Mirwais Hospital

The government relies mostly on newspaper articles to provide background information on the barricade and siege at Mirwais Hospital.[4]  Awad has not asked that I disregard those articles, conceding that "they are informative on certain points."  Tr 55:1-8.  I will accordingly consider the articles sufficiently reliable on points that are not seriously disputed: that Al Qaida fighters entered and barricaded themselves inside the Mirwais Hospital at some time during the first week of December 2001; that U.S. and affiliated forces laid siege to the hospital; and that the siege ended in late January 2002 when U.S. associated forces confronted and killed the remaining members of the Al Qaida group.  I will also turn to these articles to fill in evidentiary gaps when there is corroboration.

Awad concedes that he was captured in the Mirwais Hospital on █████████████ [b(1)]  Tr 53:21-25.  The government's primary evidence of Awad's involvement that he

---

[4] Karl Vick, *Hospital Detention of Arab Fighter Ends With Suicide*, Wash. Post, Jan 8, 2002, at A12; Drew Brown, *Al-Qauda Group Holed up in Hospital*, Phil. Inq., Dec. 30, 2001, at A10; Pamela Constable, *Kandahar Hospital Seige Ends in al Qaeda Deaths*, Wash. Post, Jan 28, 2002, at A12; Thomas E. Ricks & Karl Vicks, *U.S. Reports Calm in Afghanistan on Christmas Eve; At Kandahar Hospital, Arrest Brings Gunfire*, Wash Post, Dec. 25, 2001, at A21; Drew Brown, *Armed Patients, Not the Sick, Biggest Concern at Hospital*, Miami Herald, Dec. 26, 2001, at 21A.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

participated in the siege is statements by ███ **C6** ███████████
███ **C6** ██████ a former Guantanamo detainee who claimed to have
been inside the hospital and to have spoken with the al
Qaida fighters.  ISN ████FD-302 (June 6, 2002); **C2** ███████████
██ **C2** ████████, who was captured on December 25, 2001 (and
who denies that he was part of al Qaida), told
interrogators that he was in Afghanistan working with the
charity Al Wafa; that one day he was hit by a car; that he
woke up in Mirwais Hospital in the same room as the Al
Qaida fighters; and that they struck up a conversation.
ISN ████ FD-302 (June 6, 2002).  They told him that they
were involved in a car wreck[5] while fleeing a U.S. airstrike
and talked about their weapons, although ███ **C6** never saw
any.  ██ **C2** ████████████   ███ **C6** ████ also provided names and
descriptions for the surviving eight members of the al
Qaida group, including an **C1, C6** █████████████████████
██ **C1, C6** ██████████████████ *Id.*  Four of the other names
that ██ **C6** ███████ provided were identical to or
transliterations of names listed near "Abu Waqas" on the
Tarnak Farms document.  *Compare,* **C2** █████████████ *with,*
██ **D2** ████████████

    Awad was shown a picture of █████████ but denied ever
knowing him.  ISN 88 FD-302 (October 15, 2002).  ██ **b(1), b(2)** ████
_____
[5] Apparently there are man bad drivers in Afghanistan.

UNCLASSIFIED//FOR PUBLIC RELEASE

**b(1)**

**b(1)**    **b(2)**    Awad Aff.

¶8; **b(2)** ("When the [U.S.] airstrikes

began in the city of Kandahar [Awad was separated from

Sugara] and he never saw him again. [Awad] was pulling

someone from the rubble of a bomb destroyed building when

he was injured. . . . He woke up in a hospital . . . ."). 

Awad asserts that after his leg was amputated he was

"located near elderly patients and children" and that while

at the hospital he was "semi-conscious and in continuous

pain . . . [and was] on pain medication throughout [his]

time in the hospital that made [him] sleep."  Awad Aff.

¶14. He "denied being with the other Arabs . . . and

offered that he was on the first floor of the hospital . .

. [but] was later moved to the second floor . . . where

there were other Arabs whom he did not know."  ISN 88 FD-

302 (October 15, 2002); Awad Aff.¶¶ 12-13. **b(1)**

**b(1)**

**b(1)**                    " Awad Aff. ¶16; **b(2)**

**b(2)** 6 ("No weapons or documents were found on" Awad when he

was arrested), an assertion that is uncontested.

---

6 **b(2)** are derivative documents reflecting an
accumulation of information from other sources. Tr 32:21-

UNCLASSIFIED//FOR PUBLIC RELEASE

The only first-hand evidence offered by the government
about Awad's capture was the report of a March 2006
interview with a A6 ███████ who claimed that he led
the group that had taken Awad into custody. A6 ████ FM40
(March 15, 2006). That report is internally inconsistent,
completely unreliable, and is given no weight.



was a typographical error and that
Awad's injury more likely occurred on December 2, 2001, the
approximate date that the Al Qaida fighters barricaded
Mirwais Hospital. Although there is some evidence to

23.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

support this theory, *see*, ISN 88 ███████████████████

██████ (stating that the date of "capture" was "3 weeks

ago,"),[7] I will not credit this convenient explanation. It

does not explain why the ███████████████ states that Awad was

injured on ███████████. Nor does it explain why a

different typo in the ██████████████████████ was later

corrected, while the ████████ date was left unchanged.

*Compare*, ████████████████████████████████,

*with*, ████████████████████ *see*, Res. MJR at 26.[8]

**D.** ████████████████

    Up to this point, we have (a) a reasonable inference

that Awad went to Kandahar to fight, (b) no reliable

evidence that he was actually trained there, (c) undisputed

evidence that he was in Mirwais Hospital during part of the

siege, and (d) inconsistent evidence about how and when he

arrived there. ██████████████████████████

████████████████████████████████████████

---

[7] The parties are in general agreement that "capture" in this
document should be read as "injury." Tr. 52:2-54:9; Res.
Opp. 26-28.

[8] ████████████████████████████████████████████████
████████████████████████████████████████
████████████ Although this undermines the credibility of
any information from that document, the government was
unable to find the underlying document from which the
November 1, 2001, date was taken. Tr 33:19-23. Because
the November date is favorable to Awad and it is not
refuted with equally strong evidence, I will assume it to
be accurate.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

 Five of
their names match names found on the list provided by C6
C6      and three of them match names found on the Tarnak
Farms document. D2
D2      and C2

That
remark finds corroboration in a newspaper account of a

- 17 -

UNCLASSIFIED//FOR PUBLIC RELEASE

fighter who was killed trying to escape the siege at

Mirwais _after_ the date that Awad was captured.  Karl Vick,

_Hospital Detention of Arab Fighter Ends With Suicide_, Wash.

Post, Jan 8, 2002, at A12.



---

[9] The government relies on an identification of ▮A6▮ ▮▮▮ by
another detainee given during an interrogation taken at
Bargram, Afghanistan.  ISN ▮A2▮ FM40 (June 14, 2004).
[10] ▮▮▮▮ the Guantanamo detainee told interrogators that
he guarded the Kandahar Airport from after September 11,
2001, until mid-November 2001.  ISN ▮ FD-302 (November 1,
2002).  Although Awad argues out that this would have
prevented ▮▮▮▮ from training at Tarnak Farms when Awad
would have been there, that is not necessarily true. ▮▮▮
▮▮▮ said that he had trained at the Al Faruq camp, and it
is logical that an Al Qaida guard would receive advanced
training.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

████████████████████████████████████████

Awad denies that ████████████████████████████

He denies having met al-Dhali or al-Fadhl.  Awad Aff. ¶7.

He argues that, because the siege at Mirwais Hospital was a

well-publicized event, al-Dhali would have known that Awad

was captured, and would not have guessed that he was

hiding.  Awad also points out ████████████████████

████████████████████████████████████████████████

The following table demonstrates the importance ████████

████████████  The correlation among the names on the al

Joudi list, the Tarnak Farms list, ████████████████

████████ is too great to be mere coincidence.  The

████████████████████████████████████████████████

████████████████████ I believe, the points

that tip the scale finally in the government's favor.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



**C6** **List**

**Tarnak Farms**

**List**

**C6**

**D6**

**C6**

with an

amputated

right leg

Abu Waqas

**C6**

**D6**

## IV. Conclusion

The case against Awad is gossamer thin.   The

evidence is of a kind fit only for these unique proceedings



UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

and has very little weight.  In the end, however, it appears more likely than not that Awad was, for some period of time, "part of" al Qaida.  At the very least Awad's confessed reasons for traveling to Afghanistan and the correlation of names on a the list ████████ clearly tied to al Qaida make it more likely than not that he knew the al Qaida fighters at the hospital and joined them in the barricade.

*          *          *

The petition for writ of habeas corpus is denied.

JAMES ROBERSTON
United States District Judge

UNCLASSIFIED//FOR PUBLIC RELEASE